## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

PAULA G. SELFRIDGE, et al.,

                Plaintiffs,

v.                                CIVIL ACTION NO.  2:12-cv-02035

BOSTON SCIENTIFIC CORP., et al.,

                Defendants.

### MEMORANDUM OPINION AND ORDER

Pending is the plaintiffs' Motion to Remand [Docket 14]. The plaintiffs also seek sanctions. For the reasons discussed below, the motion to remand and the request for sanctions are both **DENIED.**

### I.     Background

This case is one of several thousand assigned to me by the Judicial Panel on Multidistrict Litigation (hereinafter the "MDL Panel"). It involves the use of transvaginal surgical mesh to treat pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI"). Paula Selfridge and her husband Michael Selfridge (collectively referred to as "plaintiffs") allege that Mrs. Selfridge suffered damage when the synthetic mesh product Boston Obtryx Device M0068317050 ("Obtryx device") was implanted into her and then "eroded into adjacent pelvic organs causing infection, hematuria and necrosis resulting in substantial pain, suffering[, and] emotional and mental distress to Plaintiff, Mrs. Selfridge." (Compl. [Docket 1], at ¶¶ 14–15). The Complaint alleges claims based on Mrs. Selfridge's injuries from the Obtryx device and Mr. Selfridge's loss

of consortium. The Complaint alleges the following causes of action: 1) negligence; 2) strict liability – design defect; 3) strict liability – manufacturing defect; 4) strict liability – failure to warn; 5) breach of express warranty; 6) breach of implied warranty; 7) fraud by intentional concealment; 8) loss of consortium; and 9) exemplary and punitive damages. (*Id*. at 1). The Complaint names as defendants: Boston Scientific Corporation ("Boston Scientific"), Dr. Louis-Jacques, Woman Care Providers, Little Company of Mary Hospital, Providence Health & Services, and Does 1 to 100, inclusive. All defendants except Boston Scientific and the Doe defendants are healthcare providers (hereinafter "healthcare defendants") who are residents of California. (*See* Notice of Removal [Docket 1], at ¶¶ 14–15).

The plaintiffs' multiple claims are based on the following alleged facts. The plaintiffs allege that the defendants "have consistently and repeatedly advertised, marketed and promoted synthetic mesh implants as being safe and effective for treating pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI")." (Compl. [Docket 1], at ¶ 11). The plaintiffs allege this promotion was faulty for several reasons. First, they allege that studies had not evaluated the safety and effectiveness of these implants over the course of months or years, and the FDA had not evaluated the safety of these implants for this use. (*Id*.). The plaintiffs allege that "[n]o clinical studies ever showed the advantage of mesh in treating prolapse over traditional repair." (*Id*. at ¶ 12). Second, they allege that the FDA has received "thousands of reports from numerous manufacturers including, but in no way limited to, Defendant, BOSTON, regarding the severe health complications" associated with the product, including:

> [b]leeding, vaginal infection or discharge, pain during sex, lower backache, erosion of the mesh through vaginal or pelvic tissue, bowel movement difficulties, bladder outlet obstruction, vaginal pain, vaginal scarring and shortening, and perceived protrusion from the vagina.

(*Id*. at ¶ 13).

Mrs. Selfridge alleges she was never warned of these risks nor did any advertisement for the Obtryx device mention them. When the health care defendants supplied the Obtryx device to Mrs. Selfridge to treat her SUI and/or POP, she was given no "notice, indication or explanation of the risks involved in being treated with a synthetic mesh product." (*Id*. at ¶ 14). The device was inserted on July 22, 2008. (*Id*.). Sometime in April 2009, Mrs. Selfridge was told by defendant Dr. Louis-Jacques that "the Obtryx Device had been removed from her pelvic cavity," when in fact it had not been entirely removed. (*Id*. at ¶ 14). The plaintiffs allege that Dr. Louis-Jacques falsely informed Mrs. Selfridge that "any further complaints or physical problems were not related to the mesh." (*Id*.). In fact, the Obtryx device was not completely removed until March 29, 2010, by Dr. Ramin Mirhashemi at defendant Little Company of Mary Hospital. (*Id*. at ¶ 15). When the device was finally removed, it had eroded into Mrs. Selfridge's pelvic organs "causing infection, hematuria and necrosis resulting in substantial pain, suffering[, and] emotional and mental distress." (*Id*.). She alleges that she "could not have known or discovered the true and actual facts pertaining to the Product placed into her pelvic cavity until on or about March 29, 2010." (*Id*.).

The plaintiffs originally brought this action on March 21, 2012 in the Superior Court of California, Los Angeles County. Boston Scientific removed this action to the Central District of California on May 24, 2012, on the basis of diversity jurisdiction, alleging that the nondiverse healthcare defendants (Dr. Louis-Jacques, Woman Care Providers, Little Company of Mary Hospital, and Providence Health & Services) were fraudulently joined. (Notice of Removal [Docket 1], at 4, 5–7). In its notice of removal, Boston Scientific argued that because all of the plaintiffs' claims against the healthcare defendants were based on "alleged professional negligence in the care, treatment, and services provided to Mrs. Selfridge," they were subject to

3

the statute of limitations in California Code of Civil Procedure § 340.5 (hereinafter "Cal. Civ. Proc. § 340.5"), which requires that an action be brought "three years after the date of injury or one year after the plaintiff discovers the injury, whichever occurs first." (*Id*. at 5). Boston Scientific contended that because the plaintiffs alleged they discovered their injury at least by March 29, 2010, but did not file until nearly two years later, on March 21, 2012, all of their claims against the healthcare defendants are barred by the statute of limitations. (*Id*. at 5–6).

After the case was removed, the plaintiffs filed a motion to remand the case to state court [Docket 14]. After the motion was filed, the MDL Panel transferred the case to MDL 2326, In re: Boston Scientific Corp., Pelvic Repair System Products Liability Litigation, and the Clerk assigned it Civil Action Number 2:12-cv-02035. The remand motion has been briefed and is ripe for review.

## II.      Legal Standard

Under 28 U.S.C. § 1407, this court has authority to rule on pre-trial motions. In multidistrict litigation cases such as this, the choice-of-law for these pre-trial motions depends on whether they involve federal or state law. "When analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located. When considering questions of state law, however, the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation." *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996) (internal citations omitted); *see Toll Bros., Inc. v. Dryvit Sys., Inc*., 432 F.3d 564, 568 n.4 (4th Cir. 2005) (applying Connecticut state law in transferred multidistrict litigation case based on diversity jurisdiction and citing to *In re Temporomandibular (TMJ) Joint Implants Prods.*

4

*Liab. Litig.*, 97 F.3d at 1055); *Bradley v. United States*, 161 F.3d 777, 782 n.4 (4th Cir. 1998);

*see also* 15 Charles A. Wright et al., *Federal Practice and Procedure*, § 3866 (3d ed. 2009).

The Honorable Shira A. Scheindlin has made a similar observation that the law of the

transferee circuit applies:

> [C]ourts have held that the law of the transferee circuit controls pretrial
> issues such as whether the court has subject matter or personal jurisdiction
> over the action, or whether the cases should be remanded to state court
> because the cases were not properly removed.

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 241 F.R.D. 435, 439 (S.D.N.Y.

2007) (footnote omitted). Judge Scheindlin's observation, as noted in her opinion, reflects the

general approach. *See*, *e.g.*, *In re Linerboard Antitrust Litig.*, No. MDL NO. 1261, Civ.A.04-

4001, 2005 WL 1625040, at *4 (E.D. Pa. July 11, 2005) (applying the law of the Third Circuit on

a motion to dismiss for lack of subject matter jurisdiction); *In re Bridgestone/Firestone, Inc.,*

*Tires Prods. Liab. Litig.*, 256 F. Supp. 2d 884, 888 (S.D. Ind. 2003) (applying the law of the

Seventh Circuit on a motion for remand to state court). Because this is a case based on diversity

jurisdiction, federal law controls procedural issues and state law controls substantive issues.

Therefore, I will use the Fourth Circuit's standards for remand and fraudulent joinder, and

California's law on the statute of limitations.

An action may be removed from state court to federal court if it is one over which the

district court would have had original jurisdiction. 28 U.S.C. § 1441(a). Courts construe removal

jurisdiction strictly because removal implicates significant federalism concerns. *Md. Stadium*

*Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260 (4th Cir. 2005). "If federal jurisdiction is

doubtful, a remand is necessary." *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151

(4th Cir. 1994). The burden of establishing federal jurisdiction is on the party seeking removal.

*Id.* Accordingly, when federal jurisdiction is based on diversity under 28 U.S.C. § 1332, the

defendant bears the burden of proving that the suit is between citizens of different states and that the amount in controversy exceeds the jurisdictional amount. *See Sayre v. Potts*, 32 F. Supp. 2d 881, 883–84 (S.D. W. Va. 1999), *abrogated on other grounds*, *Scaralto v. Ferrell*, 826 F. Supp. 2d 960 (S.D. W. Va. 2011).

Removal based on diversity jurisdiction requires complete diversity of all parties. 28 U.S.C. § 1332; *Strawbridge v. Curtiss*, 7 U.S. 267 (1806). No party involved in a diversity suit may share common citizenship with any party on the other side. *Strawbridge*, 7 U.S. 267. However, the judicially-created "fraudulent joinder" doctrine provides an exception to the complete diversity requirement, allowing a district court to assume jurisdiction even if there are nondiverse named defendants at the time of removal. *Mayes v. Rapoport*, 198 F.3d 457, 461 (4th Cir. 1999). A finding of fraudulent joinder "permits a district court to disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction." *Id.*

To show that a nondiverse defendant has been fraudulently joined, the removing party must establish either 1) that there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant in state court or 2) that there has been outright fraud in the plaintiff's pleading of jurisdictional facts. *Id.* at 464. Accordingly, the removing party bears a heavy burden, as it "must show that the plaintiff cannot establish a claim against the nondiverse defendant even after resolving all issues of fact and law in the plaintiff's favor." *Marshall v. Manville Sales Corp.*, 6 F.3d 229, 232–33 (4th Cir. 1993). As the Fourth Circuit has recognized, the fraudulent joinder standard "is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Mayes*, 198 F.3d at 464 (quoting *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999)). When deciding if

6

a party is fraudulently joined, "the court is not bound by the allegations of the pleadings, but may instead consider the entire record, and determine the basis of joinder by any means available." *Id.* (internal quotations omitted) (citing *AIDS Counseling & Testing Ctrs. v. Group W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990)).

Although the Fourth Circuit has not directly addressed the issue, many federal courts consider a statute of limitations defense as a basis for finding fraudulent joinder. *See, e.g., In re Briscoe*, 448 F.3d 201, 219 (3d Cir. 2006) ("If a district court can discern, as a matter of law, that a cause of action is time-barred under state law, it follows that the cause fails to present even a colorable claim against the non-diverse defendant."); *Ritchey v. Upjohn Drug Co*., 139 F.3d 1313, 1320 (9th Cir. 1998) ("It is pellucid that by the time the complaint in question was filed . . . the statute of limitations had long since run . . . ."); *Parkway Imaging Ctr., Inc. v. Home Life Fin. Assurance Corp*., No. 97-21024, 1999 WL 824441, at *6 (5th Cir. Sept. 27, 1999) ("We have previously held that should the defendant establish the existence of an affirmative defense to the plaintiff's state law claims, 'it necessarily follows that joinder was fraudulent, and the district court properly exercised its removal jurisdiction.'") (quoting *Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd*., 99 F.3d 746, 753 (5th Cir. 1996)); *LeBlang Motors, Ltd. v. Subaru of Am., Inc*., 148 F.3d 680, 691 (7th Cir. 1998) (finding fraudulent joinder when statute of limitations had run based on "sufficiently clear" facts presented); *Wages v. Johnson Reg'l Med. Ctr.*, No. 2:12-CV-02258, 2013 WL 120888, at *1 (W.D. Ark. Jan. 9, 2013); *Pullin v. Lowe's Home Ctrs., Inc.*, No. 5:09CV740, 2009 WL 3246905, at *1-2 (N.D. Ohio Oct. 6, 2009); *Shaffer v. Nw. Mut. Life Ins. Co*., 394 F. Supp. 2d 814, 818 (N.D. W. Va. 2005) (using statute of limitations to find fraudulent joinder because it was not difficult to determine when it began running); *Riverdale Baptist Church v. Certainteed Corp*., 349 F. Supp. 2d 943, 949 (D. Md.

2004) ("[S]uccessful fraudulent joinder/statute of limitations arguments occur in cases where the issue is fairly easy to determine, either from the face of the complaint or with resort to limited additional evidence, while courts facing more ambiguous factual situations reject such arguments."); *Owens v. Life Ins. Co. of Ga.*, 289 F. Supp. 2d 1319, 1325 (M.D. Ala. 2003). Notably, California's statute of limitations defense in particular has been considered by other courts for fraudulent joinder purposes. *See Hunter v. Philip Morris USA,* 582 F.3d 1039, 1045 (9th Cir. 2009); *Ritchey*, 139 F.3d at 1318; *Riverdale Baptist Church*, 349 F. Supp. 2d at 950.

### III.     Applicable California Statute of Limitations

In California, the applicable statute of limitations is based on the "nature of the right sued upon and not the form of action nor the relief demanded . . . ." *Thomson v. Canyon*, 198 Cal. App. 4th 594, 606–07 (2011) (quoting *Hensler v. City of Glendale*, 8 Cal. 4th 1, 22–23 (1994)); *see also Hedlund v. Superior Court*, 34 Cal. 3d 695, 704 (1983) ("Under well established principles the applicable statute of limitations is determined by the nature of the right sued upon."). "What is significant for statute of limitations purposes is the primary interest invaded by defendant's wrongful conduct." *Barton v. New United Motor Mfg., Inc.*, 43 Cal. App. 4th 1200, 1207 (1996); *see also Marin Healthcare Dist. v. Sutter Health*, 103 Cal. App. 4th 861, 875 (2002); *Rivas v. Safety-Kleen Corp.*, 98 Cal. App. 4th 218, 229 (2002) (noting cases that applied the personal injury statute of limitations to actions for breach of contract or breach of warranty and doing the same).

Boston Scientific contends that the proper statute of limitations for all of the plaintiffs' claims is California Code of Civil Procedure § 340.5, part of the Medical Injury Compensation Reform Act (hereinafter "MICRA"). MICRA was passed in 1975 in an attempt "to reduce the

cost and increase the efficiency of medical malpractice litigation by revising a number of legal rules applicable to such litigation." *Unruh-Haxton v. Regents of Univ. of Cal.*, 162 Cal. App. 4th 343, 352 (2008) (internal quotation marks omitted). One of these changes was to the statute of limitations for medical malpractice claims. *See Smith v. Ben Bennett, Inc*., 133 Cal. App. 4th 1507, 1514 (2005); *David M. v. Beverly Hosp*., 131 Cal. App. 4th 1272, 1277 (2005) (noting that the "intent in enacting MICRA was to 'restrict the tolling provisions in malpractice actions.' . . . the legislative goal in amending section 340.5 was to give insurers greater certainty about their liability for any given period of coverage, so that premiums could be set to cover costs") (quoting *Young v. Haines*, 41 Cal. 3d 883, 896, 900 (1986)). The statute reads:

> [T]he time for the commencement of action shall be *three years after the date of injury* or *one year after the plaintiff discovers*, *or* through the use of reasonable diligence *should have discovered*, the injury, **whichever occurs first**. In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following: (1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person.

Cal. Civ. Proc. § 340.5 (emphasis added). The tolling provisions in the statute apply only to the three year period. *Warren v. Schecter*, 57 Cal. App. 4th 1189, 1201 (1997) (noting that the one year period cannot be tolled by fraud, concealment, or the presence of a foreign body). "[O]nce a patient knows, or by reasonable diligence should have known, that he has been harmed through professional negligence, he has one year to bring his suit." *Gutierrez v. Mofid*, 39 Cal. 3d 892, 896 (1985).

MICRA applies to actions involving the "professional negligence" of a "health care provider." *Id*. A health care provider is "any person licensed or certified pursuant to Division 2 . . . and any clinic, health dispensary, or health facility, licensed pursuant to Division 2." Cal. Civ. Proc. § 340.5(1). Professional negligence for 340.5 is defined as:

> a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital.

Cal. Civ. Proc. § 340.5(2). Because a single set of facts can create multiple causes of action, such as battery, products liability, fraud, and breach of contract, "a plaintiff hoping to evade the restrictions of MICRA may choose to assert *only* seemingly non-MICRA causes of action." *Smith*, 133 Cal. App. 4th at 1514 (emphasis in original). Therefore, "when a cause of action is asserted against a health care provider on a legal theory other than medical malpractice, the courts must determine whether it is nevertheless based on the 'professional negligence' of the health care provider so as to trigger MICRA." *Unruh-Haxton*, 162 Cal. App. 4th at 353 (quoting *Smith*, 133 Cal. App. 4th at 1514); *see also Rivas,* 98 Cal. App. 4th at 229–230.

A claim falls under MICRA when it involves negligence or a negligence-type of action, but does not include intentional torts. *See Unruh-Haxton*, 162 Cal. App. 4th at 355; *Barris v. Cnty. of Los Angeles*, 20 Cal. 4th 101, 115–16 (1999) (noting that the California Supreme Court has "not previously held that MICRA applies to intentional torts"); *Noble v. Superior Court*, 191 Cal. App. 3d 1189, 1193 (1987). Any negligent act that occurs "in the rendering of services for which a provider is licensed" is professional negligence, regardless of the "degree of skill required." *Canister v. Emergency Ambulance Serv.,* 160 Cal. App. 4th 388, 404 (2008); *accord*, *Bellamy v. Appellate Dep't,* 50 Cal. App. 4th 797, 807 (1996). Thus California courts have applied MICRA to cases claiming negligence in the driving of an ambulance (*Canister*, 160 Cal. App. 4th at 392–93, 404–08), the improper securing of a patient to an X-ray table (*Bellamy*, 50 Cal. App. 4th at 805–08), and the failure of a doctor to report suspected child abuse (*David M.*, 131 Cal. App. 4th at 1277–78).

IV.     **Discussion**

At the outset, I note the plaintiffs' argument that Boston Scientific's response to the motion to remand was untimely, as it was filed three months after the motion was filed. By Pretrial Order # 3, I granted "an extension of time for responding by motion or answer to the complaint(s) until a date set by this court." (2:12-md-2326, [Docket 3], at ¶ 4). At a status conference in July 2012, I encouraged the parties to begin dealing with these motions, but did not set specific deadlines. I reject the plaintiffs' argument regarding timeliness and choose instead to consider the merits of this motion.

Additionally, though not raised by the plaintiffs, I note that the statute of limitations issue has been raised by the diverse defendant, Boston Scientific. The non-diverse healthcare defendants have not raised the issue because they have not been served, and therefore have neither filed appearances nor filed answers. Other federal courts have considered the statute of limitations issue in cases where it has not been raised by the non-diverse defendant but by the removing diverse defendant, and I find it appropriate to do so here, particularly where the plaintiffs have not served the healthcare defendants.[1] *Moseley v. Wyeth,* No. CIV-02-1120-M, 2002 WL 32991341, at *2 n.6 (W.D. Okla. Sept. 13, 2002) (finding that diverse defendant Wyeth had standing to assert that the non-diverse defendant, Dr. Dycus, "was fraudulently joined by showing that any claim against him is clearly barred by the statute of limitations"); *City of Syracuse v. Loomis Armored US, LLC*, No. 5:11-cv-00744 (MAD/GHL), 2011 WL 6318370, at *2, 6-7 (N.D.N.Y. Dec. 15, 2011) (noting that non-diverse defendant was never "properly joined

---

[1]     Failure to serve in-state defendants can be indicative of fraudulent joinder but not necessarily determinative. *See Moreaux v. State Farm Mut. Auto. Ins. Co.*, No. 09-396, 2009 WL 1559761, at *3-4 (W.D. La. June 3, 2009) (listing cases); *cf. Griggs v. State Farm Lloyds*, 181 F.3d 694 (5th Cir. 1999) (noting the plaintiff's failure to serve the in-state defendant indicated the plaintiff did not "intend[] to actively pursue claims against" the in-state defendant).

and served" but still denying motion to remand because the statute of limitations against non-diverse defendant had expired); *see also Bullock v. United Ben. Ins. Co.,* 165 F. Supp. 2d 1255, 1258 (M.D. Ala. 2001) (framing question as whether the removing defendant, United, had demonstrated there was no possibility the plaintiff could state a claim against the non-diverse defendant).

Turning to the merits of the plaintiffs' motion, I **FIND** that removal by Boston Scientific was proper because the healthcare defendants were fraudulently joined. As will be discussed below, the plaintiffs cannot establish any claims against the healthcare defendants because they are either barred as a matter of law, or the applicable one year statute of limitations for professional negligence had already run prior to commencement of this action. It is undisputed by the parties that the plaintiffs were aware of the injury by at least March 29, 2010. (Compl. [Docket 1], at ¶ 15). As previously noted, the one year limitation cannot be tolled, and because the plaintiffs knew or "by reasonable diligence should have known" in March of 2010 that they had been harmed through the professional negligence of the health care defendants, any claims based on professional negligence are barred by the statute of limitations in Cal. Civ. Proc. § 340.5.

### A.  Count I: Negligence

The plaintiffs allege against all defendants that they were negligent in their duty to "use reasonable care in designing, manufacturing, marketing, labeling, packaging, supplying and selling" the pelvic mesh product, and as a result of their negligence, Mrs. Selfridge suffered damages. (Compl. [Docket 1], at ¶¶ 16–19). The plaintiffs have reiterated that this count is the heart of their complaint: "The negligence asserted against the California-domiciled healthcare

providers is based upon negligence in the 'supplying and selling' of the BSC product solely and only under California product liability law." (Pls.' Reply Def.'s Opp. [Docket 29], at 8).

Regardless of how the plaintiffs attempt to describe this claim, it is based on professional negligence as defined by MICRA, as it involves the decisions of the healthcare defendants to provide Mrs. Selfridge with a particular course of treatment that included the pelvic mesh product. The decisions to use pelvic mesh to treat Mrs. Selfridge and to use a particular mesh product are at the core of the professional judgment that requires licensing for doctors, hospitals and other health facilities. *See Hedlund*, 34 Cal. 3d at 703–04 (holding that a psychiatrist's failure to warn of his patient's potential dangerousness was professional negligence because the diagnosis of the dangerous behavior "and the appropriate steps necessary to protect the victim are not separate or severable, but together constitute the duty giving rise to the cause of action."). Deciding to use a pelvic mesh product over other treatment methods was an act that occurred "in the rendering of services" for which the defendants are licensed. *See Canister,* 160 Cal. App. 4th at 404. Despite the plaintiffs' protestations to the contrary, the mere absence of any "indication, reference, description or elements necessary to allege either a medical malpractice or professional negligence action" does not bar their complaint from being subject to the requirements of MICRA, as California courts look past the wording of the pleadings to see the true nature of the right being asserted. (Pls.' Reply Def.'s Opp. [Docket 29], at 8); *see Rivas,* 98 Cal. App. 4th at 229.

### B.  Count IV: Strict Liability - Failure to Warn

The plaintiffs allege the mesh product "was defective as a matter of law due to its lack of appropriate and necessary warnings" and therefore all defendants "are strictly liable . . . for designing, manufacturing, marketing, labeling, packaging, supplying and selling a defective

Product." (Compl. [Docket 1], at ¶¶ 29–31). The plaintiffs failed to acknowledge settled California law that doctors and hospitals typically are not sellers of medical products but rather providers of services; they therefore cannot be held strictly liable. *See Carmichael v. Reitz*, 17 Cal. App. 3d 958, 979 (1971) (holding that doctor who prescribed drug was not a seller of a product and therefore could not be held strictly liable); *Silverhart v. Mount Zion Hosp.*, 20 Cal. App. 3d 1022, 1027 (1971) (holding the rationale of *Carmichael* applies to hospitals because "a hospital furnishing a surgical needle as part of the medical services it provides is not a seller engaged in the business of selling such needles but a user or consumer of such a needle"); *Hector v. Cedars-Sinai Medical Center*, 180 Cal. App. 3d 493, 504 (1986) (finding hospital cannot be held strictly liable for a defective pacemaker because it is "a provider of services rather than a seller of a product"). This is true regardless of the plaintiffs' allegation that all of the defendants "fall within the 'stream of commerce' with regards to the Obtryx Device," as California cases have already evaluated that argument and rejected it. *See Hector*, 180 Cal. App. 3d at 505–08 (reviewing arguments that a hospital who provided pacemakers was a seller of a product subject to strict liability and rejecting them, instead holding that the hospital was "a provider of medical services," that could not be held strictly liable). Any failure of the healthcare defendants to warn Mrs. Selfridge would produce only a professional negligence claim within the scope of MICRA because a health care provider's choices about the warnings given to a patient are a matter of professional judgment. *See Saxena v. Goffney*, 159 Cal. App. 4th 316, 324–25 (2008) (collecting informed consent cases and noting that such a claim "sounds in negligence" and "arises when the doctor performs a procedure without first adequately disclosing the risks and alternatives").

### C.  Count V: Breach of Express Warranty

In their fifth count, the plaintiffs claim the defendants promised the product "was safe and reasonably fit for its intended purpose," that Mrs. Selfridge and/or her health care provider "reasonably relied" on these promises, but that this express warranty was breached because the product "was unreasonably dangerous and defective and not as Defendants had represented," resulting in damage to Mrs. Selfridge. (Compl. [Docket 1], at ¶¶ 33–37). As a preliminary matter, I note that the wording of the Complaint is not entirely clear as to whether this claim is actually meant to be against the healthcare defendants. Because the Complaint lists the breach of warranty claim as being "Against Defendants, and Each of Them," out of an abundance of caution, I will assess the validity of this claim.[2]

All claims, whether in tort or in contract, are to be evaluated as to whether they are actually based on professional negligence and thus should be subject to MICRA's provisions. *See Rivas*, 98 Cal. App. 4th at 229; *see also Voth v. Wasco Pub. Util. Dist.*, 56 Cal. App. 3d 353, 357 (1976) (noting that when a legal action "is predicated on a duty independent of the contract, it will be deemed to be in tort regardless of the contractual relation of the parties"). As previously discussed, the plaintiffs' real argument is that the healthcare defendants were negligent in choosing the proper course of treatment for her medical problems and obtaining informed consent, which is an act of professional negligence. This is not a case where the doctor made specific promises that the patient then seeks to uphold. *See McKinney v. Nash*, 120 Cal. App. 3d

---

[2]      I also note that the express and implied warranty claims would fail regardless because they are based on the same premise (liability without fault related to a sale) that makes strict liability inapplicable to health care providers. *See Hector*, 180 Cal. App. at 508 n.3 (dismissing warranty claims because hospital was not seller of pacemaker); *Shepard v. Alexian Brothers Hosp.*, 33 Cal. App. 3d 606, 615 (1973) (dismissing warranty claims against hospital relating to blood transfusion because "the liability imposed by strict liability in tort and breach of express and implied warranties is virtually the same, i.e., a form of liability without fault," and the hospital was not a seller but a supplier of a service); *Garza v. Endo Pharm.*, No. CV 12-1585-CAS (OPx), 2012 WL 5267897, at *2 (C.D. Cal. Oct. 24, 2012) ("Because under California law pharmacies primarily provide a service, not a product, a breach of warranty claim does not lie.").

428, 442 (1981) ("To recover for breach of warranty or contract in a medical malpractice case, there must be proof of an express contract by which the physician clearly promises a particular result and the patient consents to treatment in reliance on that promise."); *Christ v. Lipsitz*, 99 Cal. App. 3d 894, 899 (1979) (noting that warranty theories can be alleged against doctors if the plaintiff shows the doctor "clearly promised a particular result (as distinguished from a mere generalized statement that the result will be good), and that the patient consented to an operation or other procedure in reliance on that promise"). "If there was a warranty, it was that the surgical procedure employed by defendants was the appropriate one to achieve the desired result." *Christ*, 99 Cal. App. 3d at 899. Thus, this claim is subject to the statute of limitations under Cal. Civ. Proc. § 340.5.

The plaintiff alleges that the appropriate statute of limitations for a products liability action, whether alleging strict liability, warranty, or negligence, is two years under Cal. Civ. Proc. § 335.1[3] and cites to *Bennett v. Suncloud*, 56 Cal. App. 4th 91, 98 (1997); *Sevilla v. Sterns-Roger, Inc.*, 101 Cal. App. 3d 608, 610 (1980); and *Soliman v. Philip Morris, Inc.*, 311 F.3d 966, 971 (9th Cir. 2002) for support. These cases do not contradict my analysis above for three reasons.

First, none of these cases deals with claims against healthcare providers. *Bennett* was a case against a manufacturer and seller of allegedly defective sunglasses, *Sevilla* was a case against the designer and manufacturer of an allegedly defective pan used to boil syrup, and *Soliman* was a case against multiple tobacco companies for producing defective cigarettes. None of these cases considered whether to use Cal. Civ. Proc. § 340.5 instead of Cal. Civ. Proc. § 335.1.

---

[3]     The time for commencing an action, under Cal. Civ. Proc. § 335, is "[w]ithin two years" for "[a]n action for assault, battery, or injury to, or for death of, an individual caused by the wrongful act or neglect of another." A similar provision was formerly codified at Cal. Civ. Proc. § 340, and cited by the cases relied upon by the plaintiffs.

Second, the cases themselves acknowledge that the applicable statute of limitations is not determined solely by the particular causes of actions pled in the complaint. *See Bennett*, 56 Cal. App. 4th at 97 (noting that personal injury actions are governed by same statute of limitations whether they are based on negligence or breach of warranty); *Sevilla*, 101 Cal. App. 3d at 610–11 (refusing to apply real property statute of limitations just because the product at issue, a pan for boiling syrup, was made part of a sugar refinery, because it would have created a special protection for some manufacturers from products liability and there was "no indication the state Legislature" sought that outcome); *Soliman*, 311 F.3d at 971 (applying the same product liability statute of limitations to personal injury claims "regardless of the particular legal theory invoked").

Finally, and perhaps most importantly, the highest court in California has already stated that Cal. Civ. Proc. § 340.5 was "intended to cover all personal injury claims arising from medical malpractice." *Young*, 41 Cal. 3d at 894; *see Roberts v. Cnty. of Los Angeles*, 175 Cal. App. 4th 474, 482 (2009) (quoting *Young*). "The plain legislative intent, in California as in many other states, was to treat all malpractice victims differently from other personal injury victims." *Young*, 41 Cal. 3d at 894 (internal citations omitted). The California Supreme Court's assessment of the state Legislature's intent in passing MICRA is consistent with the case law that has specifically assessed whether particular claims were actually based on "professional negligence" and thus held to Cal. Civ. Proc. § 340.5.

### D.  Count VI: Breach of Implied Warranty

The plaintiffs also allege a violation of an implied warranty "that the Product was merchantable and was fit for the ordinary purposes for which it was intended." (Compl. [Docket 1], at ¶ 40). The plaintiffs allege that Mrs. Selfridge, "individually and/or by and through her

physician, relied upon Defendants' implied warranty of merchantability in consenting to have the Product implanted in her." (*Id*. at ¶ 42). The product was not fit for its intended uses, however, and caused Mrs. Selfridge bodily harm. (*Id*. at ¶¶ 43–44).

Similar to the express warranty claim, this claim alleges wrongful conduct only on the part of Boston Scientific, the manufacturer, in its warranties to Mrs. Selfridge and/or the healthcare defendants. Because the count lists all defendants, however, I will assess its validity against the healthcare defendants. As with the express warranty claim, actions against healthcare providers should be assessed based on the real injury alleged. *See supra* part IV.C. The gravamen of the implied warranty claim is that the healthcare defendants did not give proper information to Mrs. Selfridge and that the product should not have been used to treat her medical issue. This allegation relates to the professional judgment of the health care defendants, and, as such, falls under MICRA. *See Christ*, 99 Cal. App. 3d at 899 ("It is settled that an action against a doctor arising out of his negligent treatment of a patient is an action sounding in tort and not one based upon a contract."); *Bellah v. Greenson*, 81 Cal. App. 3d 614, 625 (1978) (holding that claim for negligent breach of contract against a doctor was subject to § 340.5 instead of the statute of limitations for oral contracts).

### E.  Count VII: Fraud by Intentional Concealment

The plaintiffs allege that Dr. Louis-Jacques and Women Care Providers, LLC committed fraud by intentional concealment. Specifically, the plaintiffs allege that these two defendants violated their duty to disclose important information to Mrs. Selfridge when they concealed that the Obtryx device "had not been completely removed, or removed at all, from said Plaintiff's pelvic cavity." (Compl. [Docket 1], at ¶ 47). According to the plaintiffs, Mrs. Selfridge was

harmed because these two defendants concealed this information "in conscious disregard of Mrs. SELFRIDGE's safety," and she reasonably relied on their "deceptive conduct." (*Id*. at ¶¶ 48–52).

Whether a claim for fraud is subject to Cal. Civ. Proc. § 340.5 depends on whether the conduct in question was truly an intentional tort or merely an attempt to recast a medical malpractice claim. *See Unruh-Haxton*, 162 Cal. App. 4th at 355–56 (holding that because the fraud claim for "stealing and then selling a person's genetic material for financial gain" was "related to wrongful intentional conduct, not mere negligence," it was not subject to § 340.5); *Rivas*, 98 Cal. App. 4th at 229–31 (applying personal injury statute of limitations instead of fraud to "failure to warn" and "fraudulent concealment" claims in a products liability case because "the essence of both claims is that respondents' products were defective because they lacked warnings adequate to inform [appellants] of their toxic hazards . . .") (internal quotations omitted); *id*. at 229–230 (listing cases applying personal injury statute of limitations to cases alleging fraudulent concealment); *Nelson v. Gaunt*, 125 Cal. App. 3d 623, 635–36 (1981) (finding jury could decide whether three-year fraud statute of limitations applied when doctor told the plaintiff he would inject a substance with "absolutely no side effects," but he knew the use of silicone without approval was illegal and had recently been arrested for it); *id*. at 635 (acknowledging possibility of misrepresentation claims based "on either a fraud or negligence theory, depending on the defendant's state of mind: whether he intentionally or negligently misled the plaintiff; *Tell v. Taylor*, 191 Cal. App. 2d 266, 271 (1962) (noting that "even though the plaintiff alleges false representations on the part of the physician or fraudulent concealment, our courts have always treated the action as one for malpractice");[4] *Garlock v. Cole*, 199 Cal.

---

[4]     In *Tell*, the doctor allegedly:

> wilfully and knowingly represented to [the plaintiff patient] that she had sustained a serious injury and that no X-rays were necessary, and that the best treatment for her condition was active and vigorous manipulation of her left hip

App. 2d 11, 13, 15 (1962) (finding that action was based on medical malpractice despite fact that doctor told patient "it would take a year at least to see any improvement" when in fact the injury was permanent).

The plaintiffs argue that their fraud claim does not relate to professional negligence and thus is not subject to § 340.5 for several reasons. First, the plaintiffs argue *Tell* is inapplicable to their case because it involved an additional claim for malpractice and the opinion resulted from a summary judgment ruling. (Pls.' Mot. Remand [Docket 14-1], at 8). Second, the plaintiffs assert Boston Scientific is incorrect in stating that "fraudulent concealment[s] in personal injury actions are treated as malpractice claims and are subject to the same statute of limitations," under California law. (Pls.' Mot. Remand [Docket 14-1], at 8). The plaintiffs instead cite to three cases where the three year statute of limitations was used for the fraud claim: *Nelson*, 125 Cal. App. 3d at 636; *Willard v. Hagemeister*, 121 Cal. App. 3d 406, 416 (1981); and *Stevens v. Superior Court*, 180 Cal. App. 3d 605, 607–08 (1986). (Pls.' Mot. Remand [Docket 14-1], at 8). Finally, the plaintiffs point out that after *Rivas* was decided in 2002, the statute of limitations for product liability claims was increased from one to two years. (Pls.' Mot. Remand [Docket 14-1], at 8–9).

I **FIND** that the fraud claim is based on professional negligence and thus subject to § 340.5. First, it is irrelevant that *Tell* also included a separate claim for medical malpractice, as is the fact that the ruling in *Tell* was on a motion for summary judgment. The applicable statute of limitations is an issue of law not subject to an evidentiary standard. The only facts at issue in *Tell* dealt with whether the discovery rule applied to toll the commencement of the statute of limitations period; how long the statute of limitations period would be once it commenced was a

---

and leg; that further, on July 15, 1957, after the X-rays had revealed the fracture, the [doctor] further represented to her that her injury was of no consequence and would heal in due time.

191 Cal. App. 2d at 270.

legal question. *See Tell*, 191 Cal. App. 2d at 270–271 (holding the malpractice statute of limitations was appropriate for the plaintiff's cause of action for deceit and noting that "appellant has cited no authority in this state or elsewhere to indicate that it is possible to extend the statute of limitations in a personal injury action by bringing it on a theory of fraud").

I also am not persuaded by the plaintiffs' argument that *Nelson*, *Willard*, and *Stevens* are applicable, but *Tell* is not.[5] The plaintiffs' fraud claim concerns the doctor's alleged failure to disclose that the product had not been completely removed and his subsequent concealment of that fact from her. The harm to Mrs. Selfridge from not realizing she continued to have the mesh device implanted is analogous to a doctor misrepresenting the nature of an injury (as in *Tell*) or indicating there would likely be an improvement when in fact the injury was permanent (as in *Garlock*). It is unlike *Nelson*, where the doctor knew he was breaking the law and did not disclose to the patient that the substance was being used illegally. As the court noted:

> [t]he uncontroverted evidence indicated that Gaunt represented that the substance to be injected was safe, inert and with "absolutely no side effects." In fact, he knew that the substance was silicone. Further, and more importantly, at the time of Nelson's injections, Gaunt knew his use of silicone was illegal as he had been arrested only a few months earlier. Gaunt admitted that from the date of his arrest, he knew that State Public Health and FDA considered silicone unsafe for injection into human tissue. Yet, he injected Nelson without telling her: 1) the name of the substance; 2) the fact that it could be used only under scientific circumstances; 3) even under those conditions, its use required state or federal approval; and 4) he did not have a permit.

125 Cal. App. 3d at 635. The court in *Nelson* emphasized that the fraud statute of limitations was being used because of the egregiousness of the doctor's behavior. *Id*. This concern about extreme, outrageous misbehavior was also at issue in *Unruh-Haxton*, where the health care

---

[5]   I find it unnecessary to discuss *Willard* and *Stevens* in further detail because neither case even considered, let alone decided, what the appropriate statute of limitations was in the case. Both cases dealt with whether there were sufficient facts to support a fraud claim against doctors or a hospital, not whether a fraud claim should be held to MICRA's statute of limitations or the fraud statute of limitations. I instead will discuss cases directly on point regarding the statute of limitations question.

providers intentionally prevented the patients from discovering their genetic material was being stolen. 162 Cal. App. 4th at 355–56. Those concerns are not present in this case.

Further, the court in *Nelson* found it relevant that the plaintiff had been so misled by the doctor about the nature of the procedure that "[t]here is evidence that the procedure to which Nelson consented was substantially different from that which was performed and sufficiently different to amount to a battery." 125 Cal. App. 3d at 635. In this case, the initial use of the mesh device was not fraudulent; the plaintiff knew she was being implanted with a medical device to treat her medical problem, which is what occurred. Any lack of disclosure about the risks of the procedure goes to professional negligence, not fraud. Additionally, *Nelson* itself distinguishes from but does not overrule *Tell* and *Garlock*, which were against "a physician for treatment of either an injury or an illness," while *Nelson* was brought by a healthy plaintiff "seeking an elective medical procedure." *Id.* at 632–33. Akin to *Tell* and *Garlock*, this case is brought by a plaintiff who required medical attention for an injurious medical condition. The Obtryx device was not merely an elective medical procedure meant to address some cosmetic concern but rather part of medical treatment aimed at addressing the plaintiff's POP and/or SUI.

Finally, I do not find the post-*Rivas* amendment to Cal. Civ. Proc. § 335.1 relevant because Cal. Civ. Proc. § 340.5 is instead the appropriate statute of limitations. As discussed above in Part IV.C., Cal. Civ. Proc. § 340.5 was passed with the intent "to treat all malpractice victims differently from other personal injury victims." *Young*, 41 Cal. 3d at 894.

### F.  Count VIII: Loss of Consortium

The final claim in the complaint is on behalf of plaintiff Michael Selfridge for loss of consortium. Because this claim is "derivative" of his wife's claims, and none of her claims against the healthcare defendants are valid, it is also not allowed against the healthcare

22

defendants. *See Tucker v. CBS Radio Stations, Inc*., 194 Cal. App. 4th 1246, 1256 (2011). Because there is no possibility that the plaintiffs could establish any of their other claims against the healthcare defendants, the loss of consortium claim similarly has no possibility of success.

## V.      Sanctions

In addition to seeking remand, the plaintiffs have asked for an award of sanctions in the amount of $10,750.00 pursuant to 28 U.S.C. § 1447(c) and/or Rule 11 of the Federal Rules of Civil Procedure. "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp*., 546 U.S. 132, 141 (2005). I **FIND** that defendants did not lack an objectively reasonable basis for seeking removal, and therefore, **DENY** the plaintiffs' request for sanctions under § 1447(c). Regarding Rule 11 sanctions, the plaintiffs have not complied with Rule 11(c)(2), which requires the motion to be made separately. In any event, relief is not warranted under Rule 11 when the defendant's removal was valid, therefore I **DENY** relief under Rule 11 as well.

## VI.      Conclusion

After resolving all issues of fact and law in the plaintiffs' favor, I **FIND** there is no possibility that the plaintiffs can establish a cause of action against the healthcare defendants. Therefore, I **FIND** that the healthcare defendants were fraudulently joined. Accordingly, it is **ORDERED** that the plaintiffs' Motion to Remand [Docket 14] is **DENIED**, and their request for sanctions also is **DENIED**.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

ENTER:          April 4, 2013

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE